IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JAMES E. WRIGHT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-24-JED-FHM |
| | ) | |
| BNSF RAILWAY COMPANY | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are the motions of defendant BNSF Railway Company ("BNSF") to limit the testimony of plaintiff's treating physicians (Doc. 121) and to limit the testimony of plaintiff's expert witness, Stephen Morrissey, Ph.D (Doc. 128). Both motions seek to exclude expert opinion testimony pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiff timely responded to both motions, and BNSF filed its replies.[1]

The most common method to assess a *Daubert* motion is by conducting a *Daubert* hearing, although a hearing "is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). Here, neither party has indicated that such a hearing is necessary. After careful review of the motions and exhibits, the Court believes a hearing is not required in this case.

---

[1] As the parties refer extensively to the opinions of Dr. Morrissey and plaintiff's treating physicians in their briefing for summary judgment, the Court is addressing the *Daubert* motions regarding Dr. Morrissey and plaintiff's treating physicians before considering the summary judgment motions.

**BACKGROUND**

Plaintiff brings this action against defendant BNSF pursuant to the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et. seq.*, alleging an acute injury claim arising out of an incident on January 20, 2010 and a cumulative trauma claim resulting from his over twenty-nine years of service with BNSF. (Doc. 2).

**DISCUSSION**

**I.   Defendant's *Daubert* Motion Regarding Plaintiff's Treating Physicians and Brief in Support (Doc. 121)**

Plaintiff identified nine treating physicians as "non-retained experts" that will testify about the "diagnosis, treatment, prognosis, causation, permanence and medical bills associated with the injuries claimed in this lawsuit." (Doc. 121, Ex. 3; Doc. 132, Ex. 4). The nine physicians are: Dr. Jon Orjala, Dr. George Schoedinger, Dr. Richard Thomas, Dr. Brandon Claflin, Dr. David Hicks, Dr. Brent Wakefield, Dr. Lance Hoose, Dr. Russell Gilstrap, and Dr. Lam Nguyen. *Id.* BNSF does not challenge the physicians' qualifications or training. Rather, BNSF has moved to limit the opinion testimony from each treating physician based on its position that Rule 26(a)(2)(B) limits the physicians to offering opinions only about their treatment of plaintiff, and alternatively, that the physicians may not testify as to causation under *Daubert*. Plaintiff responds that Rule 26(a)(2)(b) is inapplicable because the treating physicians were not retained as expert witnesses, and that *Daubert* permits the physicians' opinions regarding causation.

**A. Admissible opinion testimony as to causation under Rule 26(a)(2)**

BNSF argues that plaintiff may not use his treating physicians to testify beyond the scope of their actual treatment of plaintiff—specifically as to causation—because plaintiff did not designate them as expert witnesses and the physicians did not submit expert reports. Plaintiff

2

responds that the physicians were designated as non-expert witnesses under Rule 26(a)(2)(C) and as such were not required to provide expert reports.

Rule 26(a)(2)(B) requires witnesses "retained or specially employed to provide expert testimony in the case," to produce a written report. Fed. R. Civ. P. 26(a)(2)(B). On the other hand, witnesses not designated as experts may testify without providing a written report. Fed. R. Civ. P. 26(a)(2)(C). Indeed, the Advisory Committee Notes to Rule 26 state that a "treating physician . . . can be deposed or called to testify at trial without any requirement for a written report." The Court finds that the treating physicians were properly designated as non-expert witnesses pursuant to Rule 26(a)(2)(C), and were not required to provide a written reports.

However, there are limits on the testimony that experts designated under Rule 26(a)(2)(C) may provide. It is clear that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party." *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999). A treating physician's testimony may include opinions regarding "'prognosis, the extent of present and future disability, and the need for future medical treatment,'" so long as the opinions are based on the physician's personal knowledge gained from the care and treatment of the plaintiff. *Adrean v. Lopez*, 2011 WL 6141121 (N.D. Okla. Dec. 9, 2011) (quoting *Goeken v. Wal-Mart Stores, Inc.*, 2001 WL 1159751, at *3 (D. Kan. Aug. 16, 2001)). The testimony may also extend to opinions on causation, but only "to the limited extent that opinions about the cause of an injury are a necessary part of a patient's treatment." *Starling v. Union Pac. R. Co.*, 203 F.R.D. 468, 479 (D. Kan. 2001); *see also Richard v. Hinshaw*, 2013 WL 6709674, at *2 (D. Kan. Dec. 18, 2013) ("[M]atters within the scope of [treating physician's] treatment may include opinions about causation, diagnosis, and prognosis"); *Trejo v. Franklin*, 2007 WL 2221433, at *1 (D.

3

Colo. July 30, 2007) (stating that "treating physician opinions regarding causation and prognosis based on examination and treatment of the patient" are proper under Rule 26(a)(2)(C)).

BNSF specifically references concerns that Dr. Orjala, Dr. Thomas, and Dr. Hicks became aware of information related to plaintiff's employment "not from actual treatment but from this lawsuit." (Doc. 121 at 15). BNSF also states that Dr. Wakefield, Dr. Nguyen, Dr. Claflin, and Dr. Hoose were "primarily concerned with treating Plaintiff and not trying to figure out the cause of his injuries." (*Id.*). BNSF next contends that Dr. Schoedinger and Dr. Gilstrap cannot demonstrate that they considered the cause of Plaintiff's injury as a necessary part of the patient's treatment" in part because neither have been to plaintiff's place of work. (Doc. 121 at 15-16).

Plaintiff's disclosure states that each treating physician will opine on the "diagnosis, treatment, prognosis, causation, permanence and medical bills associated with the injuries claimed in this lawsuit." Plaintiff's preliminary witness list then states that each doctor will "testify in accordance with his records." (Doc. 134, Ex. 4.) . Importantly, plaintiff does not state that the treating physicians' opinions will be limited to the physicians' own personal care and treatment of plaintiff. The Court thus finds it appropriate to limit the treating physicians' testimony regarding causation to the extent that it does not arise from their treatment of plaintiff. BNSF's motion is **granted** in this regard.

### B. Admissible opinion testimony as to causation under *Daubert*

Alternatively, BNSF argues that the treating physicians' testimony regarding causation is inadmissible under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). More precisely, BNSF argues that because none of plaintiff's treating physicians conducted an inquiry as to plaintiff's work, observed plaintiff's

work, conducted testing on the forces involved in plaintiff's work, consulted literature on the subject, or performed a differential diagnosis, their opinions as to causation and lack sufficient reliability and should be excluded under *Daubert*. In response, plaintiff asserts that the opinions are sufficiently reliable and that any of BNSF's perceived limitations affect the weight of the testimony, not its admissibility.

Pursuant to Federal Rule of Evidence 702, "[e]xpert testimony is admissible only if it is potentially helpful to the jury and '(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case.'" *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (quoting Fed. R. Evid. 702). In *Daubert*, the Supreme Court suggested the following factors to guide "trial courts in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Id.* at 985 (citing *Daubert*, 509 U.S. at 593-94). The *Daubert* inquiry is "flexible," and the district court need not consider each factor. *Id*. at 989-90; *see also Bitler v. A.O. Smith. Corp*., 400 F.3d 1227, 1233 (10th Cir. 2004) ("[T]his list is neither definitive nor exhaustive and . . . a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability.").

The district court functions as a gatekeeper in deciding whether to allow testimony under Rule 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999). To find expert opinions admissible, the court must conduct a two-part analysis: first, the court must determine that the

witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the court must determine "whether the witness' opinions are 'reliable' under the principles set forth" in *Daubert* and *Kumho Tire*. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

Importantly, while an expert opinion "'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)). The district court may properly allow expert testimony that is allegedly inadequate or incomplete "provided the inadequacies are known to the defendant in order to thoroughly cross-examine the witness." *Hertz Corp. v. Gaddis-Walker Elec., Inc.*, 125 F.3d 862 (10th Cir. 1997) (citing *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1482-83 (10th Cir. 1985)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination . . . [is] the traditional and appropriate means of attacking shaky but admissible evidence.").

As BNSF raises no issue as to the physicians' qualifications, the Court focuses its attention on the reliability of the physicians' opinions. As an initial matter, the Court is not persuaded by BNSF's argument that the physicians' collective failure to consider relevant literature, observe plaintiff's work, or conduct testing on the forces involved in plaintiff's work conclusively renders the opinions inadmissible. These issues go to the weight of the experts' testimony rather than to their admissibility. *See, e.g.*, *Tingey v. Radionics*, 193 F. App'x 747, 767 (10th Cir. 2006) (unpublished) ("'[D]isputes as to the strength of [an expert's] credentials, faults in his . . . methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony."); *Smith v. BNSF Ry. Co.*, 2011 WL 7053631, at \*4 (W.D.

Okla. Sept. 14, 2011) (expert opinion not unreliable where expert did not personally observe plaintiff's working environment or inquire into plaintiff's description of his working conditions); *Burton v. R.J. Reynolds Tobacco Co.*, 183 F. Supp. 2d 1308, 1313 (D. Kan. 2002) (expert's failure to identify specific studies affected weight of opinion, not its admissibility).

The Court is similarly unpersuaded by BNSF's argument that the physicians' failure to perform differential diagnoses[2] precludes their opinion testimony on causation. (Doc. 121 at 18). While a differential diagnosis is a common method of analysis in the medical context that federal courts have regularly found reliable under *Daubert*, *Bitler*, 391 F.3d at 1123, it is "not required for a treating physician's testimony to be admissible," *Watson v. Taylor*, 2006 WL 6901064, at *3 (D. Kan. July 31, 2006).

### i. Dr. Jon Orjala

Dr. Orjala is an orthopedic surgeon who operated on plaintiff's shoulder. Dr. Orjala has treated other patients who work for the railroad and have complained about problems similar to those experienced by plaintiff, namely having to use a sledge hammer and pry bars to separate the cars. (Doc. 134, Ex. 11, 10:22-25). Dr. Orjala conducted several examinations of plaintiff (Doc. 134, Exs. 14-16), and ultimately placed final permanent restrictions on plaintiff on November 23, 2010, which disqualified plaintiff from performing heavy industrial employment as a carman. (Ex. 16). Dr. Orjala received biomechanical training and has read epidemiological studies. (Ex. 11, 21:14-25:23). In his medical records, Dr. Orjala noted that the "precipitating event was using a pry bar at work January 20, 2010." (Doc. 134, Ex. 11, 12:22-25). Dr. Orjala testified that it is not outside of his area of expertise to opine on the effect of a particular task on

---

[2] Differential diagnosis refers to a physician's "determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Bitler*, 391 F.3d at 1123 (internal quotations and citations omitted).

a patient's shoulder, and that he understands what type of damage can be caused when a patient uses force through his shoulder. (Doc. 134, Ex. 12, 96:4-97:3). The Court finds that Dr. Orjala's opinion on causation is sufficiently reliable and thus admissible. BNSF's contentions affect the weight of his opinion, not its admissibility.

### ii. Dr. George Schoedinger

Dr. Schoedinger is a recently retired orthopedic surgeon who treated plaintiff for his neck and back problems. His experience included treating injured railroad employees in FELA matters for approximately 35-40 years. (Doc. 134, Ex. 17, 25:8-13). Dr. Schoedinger's records reveal that he extensively examined plaintiff. (Doc. 134, Ex. 18). He took x-rays of plaintiff, which showed degenerative changes in plaintiff's neck and lumbar spine. (Doc. 134, Ex. 17, 51:4-15). Dr. Schoedinger's testing of plaintiff revealed that plaintiff had degenerative changes with disc protrusions and lumbar study, a nerve root filling defect, and ventral elevation of the thecal sac. (Doc. 134, Ex. 18). He testified that plaintiff could not return to unrestricted heavy industrial activity based on the x-rays and his personal examination of plaintiff. (Doc. 134, Ex. 17, 69:25-72:5). He further testified that activities that "impose stresses on the spine" will cause degenerative change. (Doc. 134, Ex. 17, 51:9-12). Given Dr. Schoedinger's experience treating other railroad employees and his testing of plaintiff, the Court finds that his opinion regarding the causation of plaintiff's injuries to be sufficiently reliable and admissible.

### iii. Dr. Richard Thomas

Dr. Thomas is an orthopedic surgeon whom plaintiff initially visited for pain in his neck and lower back. (Doc. 139, Ex. 19, 89:21-24). Dr. Thomas analyzed plaintiff's history, performed an exam, and assessed plaintiff with lumbar radiculopathy, degenerative lumbar disc, and cervical pain. (Doc. 134, Ex. 19, 91:7-18). Plaintiff described to Mr. Thomas the types of

exertion his job required. (Doc. 134, Ex. 19, 109:8-110:1). Dr. Thomas' assessment of plaintiff was based upon plaintiff's complaints. (Doc. 134, Ex. 19, 92:11-13). After obtaining an EMG test, MRI report, and reviewing x-rays, Dr. Thomas found that plaintiff had degenerative lumbar disc and lumbar radiculopathy. (Doc. 134, Ex. 19, 98:23-99:16). Later, Dr. Thomas obtained an MRI that showed degenerative changes in plaintiff's cervical and thoracic spine. (Doc. 134, Ex. 19, 102:9-23). He testified that degenerative changes in plaintiff's lumbar spine were consistent with the performance of heavy manual labor for more than 20 years. (Doc. 134, Ex. 19, 100:22-101:12). Dr. Thomas testified that plaintiff's job with the railroad could be a contributing factor to his ongoing spine pain. (Doc. 134, Ex. 19, 113:21-115:11). He further testified that the degenerative changes in plaintiff's spine are permanent. (Doc. 134, Ex. 19, 117:13-18). The Court finds Dr. Thomas' opinion on causation to be supported by Dr. Thomas' in-depth examination of plaintiff and is admissible.

### iv. Dr. Brandon Claflin

Dr. Claflin is an interventional pain physician who has received training in ergonomics and biomechanics. At his deposition, he testified that plaintiff provided a medical history suggesting he had back problems while working for the railroad dating back to the 1980s. (Doc. 134, Ex. 5, 50:20-51:4). Dr. Claflin reviewed an MRI of plaintiff's back and extensively examined plaintiff's back. At his deposition, Dr. Claflin testified that it was "possible" that the job duties plaintiff was required to perform could predispose him to the problems he was experiencing. (Doc. 134, Ex. 5, 60:20-61:24). Dr. Calflin testified that his primary concern was to treat plaintiff but he was also concerned with determining "what led up to . . . the service [he] was providing." (Doc. 121, Ex. 12, 39:20-25). Dr. Calflin also stated that he could not testify whether plaintiff's injuries were more likely caused by his work or by non-work activities. (Doc.

121, Ex. 12, 45:1-8). He admitted that he would be speculating if he were to say that plaintiff's back condition was caused by cumulative trauma. (Doc. 121, Ex. 12, 42:4-43:2). The Court thus finds that Dr. Claflin's opinion is not sufficiently reliable and will be excluded.

### v. Dr. David Hicks

Dr. Hicks is an orthopedic surgeon who specializes in neck and back problems. (Doc. 134, Ex. 7, 31:5-32:5). Dr. Hicks met with plaintiff once. (Doc. 134, Ex. 7, 43:21). After reviewing plaintiff's history, conducting a physical examination, and reviewing the results of plaintiff's x-ray exam, a myelogram, and CAT scan, Dr. Hicks diagnosed plaintiff with lumbar degenerative disease at four levels in his lower back. (Doc. 134, Ex. 7, 38:15-39:3). Dr. Hicks advised plaintiff that surgery would not help his lower back. (Doc. 134, Ex. 7, 51:22-52:1). In response to a hypothetical, Dr. Hicks testified that plaintiff's work activities contributed in some way to his degenerative disc disease. (Doc. 134, Ex. 7, 40:1-25). The Court determines there is a sufficient factual basis to support Dr. Hicks' opinion as to the causation of plaintiff's injury. The jury can properly determine the weight to afford his opinion at trial.

### vi. Dr. Brent Wakefield

Dr. Wakefield is a family medicine doctor who began treating plaintiff in January 2011. (Doc. 134, Ex. 20, 10:18-21). Dr. Wakefield referred plaintiff to an orthopedist in pain management. (Doc. 134, Ex. 20, 23:8-11). Dr. Wakefield testified that plaintiff's condition, specifically his limited range of motion and muscle spasm in his back, was "consistent with a repetitive type strain injury." (Doc. 134, Ex. 20, 58:14-23). He stated that he did not know if the repetitive trauma was due to plaintiff's work or not. (Doc. 134, Ex. 20, 60:2-8). He further testified that plaintiff's injuries were not consistent with everyday living and normal wear and tear, but were consistent with repetitive injury. (Doc. 134, Ex. 20, 63:23-64:6). Dr. Wakefield's

assessment was based on his examination of plaintiff and the history plaintiff provided to him. (Doc. 134, Ex. 20, 57:14-58:3). He agreed that degenerative changes may happen regardless of an individual's trauma and occupation. (Doc. 121, Ex. 8, 64:21-23). While a close call, the Court finds Dr. Wakefield's opinion as to the cause of plaintiff's injury will be helpful to the jury, is sufficiently reliable, and is therefore admissible.

        vii.    **Dr. Lance Hoose**

Dr. Hoose is a chiropractor who treated plaintiff's shoulder, neck, and back. Plaintiff visited Dr. Hoose eleven times. (Doc. 134, Ex. 8, 77:7-10). Plaintiff told Dr. Hoose that he did manual labor at the railroad. (Doc. 134, Ex. 8, 60:15-18). After reviewing plaintiff's history, x-rays, and conducting an exam of plaintiff which involved several tests, Dr. Hoose testified that plaintiff's manual work could have caused his neck and back injuries and that his injuries could not have been a result of normal wear and tear. (Doc. 134, Ex. 8, 58:23-59:19). Dr. Hoose testified that he could not, with reasonably medical certainty, give any opinion on whether plaintiff's condition was caused by cumulative trauma. (Doc. 121, Ex. 13, 56:20-24). The Court finds that Dr. Hoose's extensive treatment of plaintiff combined with his experience renders his opinion as to causation sufficiently reliable. The weight of the testimony is for the jury to decide.

        viii.    **Dr. Russell Gilstrap**

Dr. Gilstrap is a chiropractor whom plaintiff visited to receive physical therapy for his back. Dr. Gilstrap testified that he has treated several railroad employees in the past. (Doc. 134, Ex. 6, 9:5-8). He further testified that his job requires him to "define the . . . causative injury" of a patient, whether the cause was repetitive trauma or a specific injury. (Doc. 134, Ex. 6, 48:2-5). Dr. Gilstrap also testified that he could render an opinion that plaintiff's pain in his neck,

radiculopathy, low back pain, and shoulder pain was related to plaintiff's work. (Doc. 121, Ex. 10, 51:12-16). The Court finds sufficient factual basis exists to support Dr. Gilstrap's opinion as to the cause of plaintiff's injuries.

### ix.     Dr. Lam Nguyen

Dr. Nguyen is an interventional pain specialist who treated plaintiff for his back pain in 2011. (Doc. 134 at 6, ¶ 12). BNSF argues that plaintiff cites no causation or negligence opinions for Dr. Nguyen, which plaintiff does not dispute. At his deposition, Dr. Nguyen admitted that he did not know if plaintiff experienced repetitive trauma, that he was not an expert in determining whether an injury was a result of cumulative trauma, and that he did not review any articles, treatises, or medical literature on cumulative trauma or causation. (Doc. 121-11). Dr. Nguyen also testified that he could not provide any medical testimony as to whether plaintiff's conditions were more likely caused by his work or by his outside activities. (Doc. 121-11, 40:11-16). The Court agrees that Dr. Nguyen has offered no opinion as to the cause of plaintiff's injuries and finds that Dr. Nguyen may not opine on causation at trial.

Thus BNSF's motion is **granted** as to Dr. Calflin and Dr. Nguyen, but denied as to plaintiff's other treating physicians.

### II.     Defendant's *Daubert* Motion Regarding Stephen J. Morrissey, Ph.D and Brief in Support (Doc. 128).

BNSF seeks to exclude the opinion testimony of plaintiff's sole expert witness, Stephen Morrissey, Ph.D. pursuant to Rule 702 of the Federal Rules of Evidence and under the Supreme Court's holding in *Daubert*. BNSF's Motion is premised on its argument that Dr. Morrissey's opinion is not based upon sufficient facts or data nor is the product of reliable methodology. In response, plaintiff argues that Dr. Morrissey's expert opinion is properly admissible as it is based upon his extensive knowledge and experience in railroad industry matters, government and

railroad industry studies and publications, internal BNSF documents, and examination of plaintiff.

Dr. Morrissey is a Human Factors-Ergonomics Engineering Consultant, Board Certified Professional Ergonomist, and a registered Professional Engineer. (Doc. 133, Ex. 1; Doc. 128, Ex. 3). He has been retained in over 200 cases, most of which were brought under FELA. (Doc. 128, Ex.3). Dr. Morrissey submitted a 34-page expert report in this case. (Doc. 128, Ex. 3; Doc. 133, Ex. 1 (hereinafter "Report")). At the conclusion of his report, Dr. Morrissey offers the following opinions: that plaintiff's work as a carman for BNSF exposed him to ergonomic risk factors; that BNSF was aware of the ergonomic risks to which plaintiff was exposed and while there were means to reduce plaintiff's exposure to such risks, BNSF decided not to implement them; and that plaintiff did not have proper tools, equipment, and help to safely perform his duties and any requests of his were not timely responded to, if responded to at all. (Report at 28). Dr. Morrissey also offers the opinion that these conditions created an unsafe work environment and caused plaintiff's injuries. (*Id.*). Lastly, Dr. Morrissey opines that plaintiff's injuries were preventable. (*Id.*).

BNSF does not contest Dr. Morrissey's qualifications, but rather challenges the reliability of his opinions as to plaintiff's acute and cumulative injury claims. First, BNSF argues that Mr. Morrissey's opinion is not based on sufficient facts and data. Specifically, BNSF argues that Mr. Morrissey has no facts or data to support his opinion as to plaintiff's acute injury claim that BNSF should have provided plaintiff with more manpower or better tools. (Doc. 128 at 13-14). BNSF also contends that Mr. Morrissey's opinion as to cumulative trauma is not reliable because Mr. Morrissey did not personally assess plaintiff's work environment and did no "scientific

testing" of the exposures, impacts, vibrations, and forces plaintiff experienced while on duty. (*Id.* at 14).

The Court rejects BNSF's arguments. Dr. Morrissey grounded his opinions in published studies and analyses regarding the ergonomic risk factors associated with the tasks plaintiff routinely completed as part of his employment as a carman, industry standard job analyses of the carman position, and recommendations on reducing exposure to ergonomic risk factors within the railroad industry. (Report at 10-20). Indeed, and directly relevant to BNSF's first contention regarding acute injury, the recommendations Dr. Morrissey cited in his report included "tool and equipment (re)design, work scheduling, adequate staffing, training and improved work methods." (Report at 7).

In addition, Dr. Morrissey reviewed plaintiff's deposition testimony, interviewed plaintiff, analyzed a lengthy questionnaire[3] plaintiff completed, and reviewed numerous published studies and analyses. Dr. Morrissey referred to "at least 100 pieces of literature when analyzing plaintiff's work environment." (Doc. 133 at 12). As plaintiff states, it was impossible for Dr. Morrissey to observe plaintiff perform his job duties and to measure, inspect, and test the forces plaintiff was subject to because plaintiff no longer worked for BNSF at the time of this litigation. (*Id.* at 11). The Court also notes that Dr. Morrissey referred to evaluations by others who were employed as carmen by BNSF, which plaintiff determined were accurate representations of his work exposure and duties. (Report at 9). The Court thus finds that the fact Dr. Morrissey did not visit plaintiff's place of work nor conduct testing specific to plaintiff's job tasks does not render the opinion inadmissible. Moreover, while Dr. Morrissey's analysis is

---

[3] BNSF contends that the questionnaire is "incompetent evidence" in large part because a tabulation of plaintiff's answers to the questionnaire indicates that he worked 172 hours and 52 minutes per week during his employment with BNSF. (Doc. 128 at ¶ 28).

based in part upon what the plaintiff relayed to him, whether through the questionnaire, or deposition or interview testimony, the mere fact that he relied on plaintiff's representations does not make his opinion inadmissible by default. *Smith v. BNSF Ry. Co.*, 2011 WL 4054858, at *4 (W.D. Okla. Sept. 12, 2011) (rejecting BNSF's argument that Dr. Morrisey's expert report was inadmissible because his description of plaintiff's job duties was only based on plaintiff's representations).

To the extent that BNSF maintains that the factual bases of Dr. Morrissey's opinion are insufficient, BNSF may attack these bases by cross-examination at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination . . . [is] the traditional and appropriate means of attacking shaky but admissible evidence.").

Second, BNSF argues that Mr. Morrissey should not be allowed to testify as to causation of plaintiff's cumulative trauma claim because Mr. Morrissey failed to employ a reliable methodology in arriving at his opinion. In support of this argument, BNSF applies the four *Daubert* factors[4] and states that Dr. Morrisey's report cannot meet any of the factors. (Doc. 128 at 16-17). However, district courts have discretion in assessing reliability under *Daubert* and are not required to strictly apply all four factors. *See Baines*, 573 F.3d at 989-90; *Kumho Tire Co.*, 526 U.S. at 138 ("The *Daubert* factors do *not* constitute a definitive checklist or test."). The Court's gatekeeper role requires that it determine whether an expert's opinion is reliable based on the particular facts of the case. *See Kumho*, 526 U.S. at 138. In short, the Court finds Dr. Morrissey's opinions sufficiently reliable under Rule 702 and *Daubert*.

---

[4] As stated above, the four *Daubert* factors are: (1) whether the expert's theory or technique can or has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there is a known or potential error rate associated with the theory or technique used; and (4) whether the theory or technique has obtained general acceptance within the scientific community. *Daubert*, 509 U.S. at 593-94.

At his deposition, Dr. Morrissey stated that his preferred method of performing an ergonomic analysis would include a site visit, but admitted that he did not conduct a site visit in this case. (Doc. 128, Ex. 4, 66:25-67:6). Dr. Morrissey also testified that he did not conduct a job task analysis in this case. (Doc. 128, Ex. 4, 56:25-58:6). BNSF contends that Dr. Morrissey's failure to follow "his own" methodology combined with his failure to perform a job task analysis specific to plaintiff weighs against admissibility of his opinion. (Doc. 128 at 17). The Court has rejected BNSF's argument as to Dr. Morrisey's failure to perform a job task analysis above, and rejects it here on the same grounds.

Contrary to BNSF's assertion that Dr. Morrissey employed "no methodology at all," the Court finds that his opinion is properly based upon his knowledge, expertise, and familiarity with the railroad industry, as well as numerous studies and analyses of internal BNSF documents. Moreover, the Court finds the district court's analysis in *Smith v. BNSF Railway Co.*, 2011 WL 4054858 (W.D. Okla. Sept. 12, 2011) helpful. There, BNSF also challenged Dr. Morrissey's expert opinion that the plaintiff's injuries were caused by cumulative trauma. In response to BNSF's argument that Dr. Morrisey's report did not satisfy the *Daubert* factors, the district court stated:

> The Morrissey report reflects that the subject of the physical effect of ergonomic conditions on employees has been widely studied, analyzed, and discussed in published studies. To suggest that the general conclusions of Dr. Morrissey have not been subject to scientific study or peer review is contrary to the evidence before the Court. Similarly, the application of these conditions to railroad employees is also supported by reference to published studies and analyses, and to suggest otherwise is also contrary to that evidence. In addition, Dr. Morrissey's opinion that the railroad industry is aware of risk factors associated with certain working conditions is documented by citation to published studies and reports; he also cites written materials in support of his opinion that BNSF had knowledge of the risks associated with the type of work performed by Plaintiff.

*Id.* at *4. The court then determined that the expert opinion was reliable under *Daubert*. (*Id.*). For the same reasons, the Court agrees with plaintiff and determines that Dr. Morrissey's report is properly admissibly under Rule 702 and *Daubert*. Moreover, the Court finds that any purported weaknesses in Dr. Morrissey's methodology are best exposed through cross-examination, rather than remedied by exclusion.

BNSF's motion to limit Dr. Morrisey's opinion on causation is accordingly **denied.**

**IT IS THEREFORE ORDERED** that:

Defendant's *Daubert* Motion Regarding Plaintiff's Treating Physicians and Brief in Support (Doc. 121) **is granted in part and denied in part**, as provided herein.

Defendant's *Daubert* Motion Regarding Stephen J. Morrissey, Ph.D and Brief in Support (Doc. 128) is **denied**.

**SO ORDERED** this 28th day of March, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE